# Matter of S-E-G-, et al., Respondents

*Decided July 30, 2008*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

Neither Salvadoran youth who have been subjected to recruitment efforts by the MS-13 gang and who have rejected or resisted membership in the gang based on their own personal, moral, and religious opposition to the gang's values and activities nor the family members of such Salvadoran youth constitute a "particular social group."

FOR RESPONDENT: Benjamin Casper, Esquire, West St. Paul, Minnesota

BEFORE: Board Panel: GRANT and MILLER, Board Members; CLARK, Temporary Board Member.

GRANT, Board Member:

In a decision dated September 6, 2006, an Immigration Judge denied the respondents' applications for asylum, withholding of removal, and protection under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46. 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture"). The respondents have appealed from that decision. The Department of Homeland Security has not provided a response. The appeal will be dismissed.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. Facts

At the time of the hearing, the female respondent was 19 years old and her two younger brothers were 16 years old. The respondents lived in El Salvador, but they fled their country in 2004 because of violence and threats from a criminal gang called the "Mara Salvatrucha" or "MS-13." The MS-13 threatened the youth in the area and controlled the neighborhood in which the respondents lived.

In June 2004, the MS-13 stole money from the brothers, harassed and beat them for refusing to join their gang, and threatened to rape or harm the female respondent. Neither of the brothers required medical treatment as a result of the beatings, but armed MS-13 gang members warned the respondents that the brothers must join the gang or else their bodies might end up in a dumpster or in the street someday. Fearing retaliation and believing the police would not help them, the respondents never reported the beatings and threats to the two police officers in their neighborhood. Eventually, the MS-13 warned the respondents that they had been given sufficient time to make a decision about whether to join the gang, and they advised the respondents to take the gang seriously because the threats were not a game. A few months prior to their departure from El Salvador, the respondents also learned that the MS-13 shot and killed a young boy in the neighborhood after he refused to join the gang.

The respondent's expert witness, a professor at the Central American University, studied gangs or "maras" in El Salvador since 1996. He testified that the MS-13, which originated in Los Angeles, California, and spread to Latin America, is comprised of youth who operate mainly in urban areas and who often commit serious crimes. The MS-13 is active in the area where the respondents' hometown is located. Although the Salvadoran Government prosecutes and imprisons gang members, gangs have become stronger and more organized over the past 15 years. The "Manoduro" was a policy of the former Government to control the gangs, and the current Government has unveiled a new anti-gang plan called the Master Plan for Security. Some mainly private programs exist to help Salvadoran youth avoid the gangs, but the Government programs are weak and focus on gang suppression, rather than on gang prevention.

In the professor's opinion, the police are not capable of controlling the MS-13, which acquires members, in part, through the forcible recruitment of young males who live within an MS-13 controlled zone. Economic position is an important factor in determining whether an individual will be recruited by a gang, since the gang is less likely to recruit young people from middle or upper middle class areas. The average age for recruitment is 12 years of age, and gangs retaliate against those who refuse recruitment efforts by threatening the potential recruit and his family members. An individual who refuses recruitment by the MS-13 would have a reasonable fear of harm in El Salvador because it is a small country, there is a constant flow of information and communication within the country, and it would be very difficult to find a place where a person could be sure of not being identified by the MS-13. Because gang members have some influence within the Government and on certain police officials, they can protect themselves from prosecution.

## B.  Immigration Judge's Decision

The Immigration Judge found that the respondents were removable based on their own admissions. He also determined that their testimony was credible but concluded that they had failed to establish either past persecution or a well-founded fear of future persecution on account of a protected ground. The Immigration Judge ruled that the beatings and threats against the respondents were based on the gang's desire to recruit new members and fill their ranks, rather than to punish the respondents for their membership in a particular social group or their political opinion. Finding a lack of the required nexus, the Immigration Judge denied the respondents' applications for asylum and withholding of removal.

The Immigration Judge also determined that the respondents failed to establish that the Government of El Salvador was unable or unwilling to control the criminal gangs.  He concluded that the background evidence indicated that the Government had made a number of efforts to control the gangs and had arrested and prosecuted their members through various gang suppression programs. The Immigration Judge also denied the respondents' claims under the Convention Against Torture, concluding that the Government of El Salvador had not acquiesced in the gang activities, although it is having difficulty controlling the gangs. *See* 8 C.F.R. § 1208.18(a)(1) (2008).

## C.  Arguments on Appeal

On appeal, the respondents argue that they produced adequate evidence to show that their persecutors were motivated to harm them because of their membership in the particular social groups of (1) Salvadoran youth who have been subjected to recruitment efforts by MS-13 and who have rejected or resisted membership in the gang based on their own personal, moral, and religious opposition to the gang's values and activities; and (2) family members of such Salvadoran youth. The respondents also argue that the gang members persecuted them on account of their political opinion, i.e., that of opposition to the gang's activities.

## II.  ANALYSIS

An applicant for asylum has the burden of establishing that he or she is a refugee within the meaning of section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42) (2006).  To do this, the alien must demonstrate that he or she has suffered past persecution or has a well-founded fear of future persecution on account of one of the five enumerated grounds in section 101(a)(42), which include race, religion, nationality, membership in a

particular social group, or political opinion.  *See INS v. Elias Zacarias*, 502 U.S. 478 (1992); *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987).  We first address whether the respondents have established membership in a particular social group.

## A.  Particular Social Group

We have not previously addressed whether either of the putative social groups described by the respondents—Salavadoran youths who have resisted gang recruitment, or family members of such Salvadoran youth—constitutes a "particular social group" cognizable under section 101(a)(42) of the Act. Likewise, while several Federal circuit courts have issued decisions in related cases, none has specifically addressed whether those who have resisted recruitment to such gangs constitute a particular social group.  For example, the United States Court of Appeals for the Eighth Circuit, in whose jurisdiction this case arises, held that an El Salvadoran who had been shot at by a gang member, and had family members severely injured or killed by the gang member, failed to establish that the harm was inflicted by the Government of El Salvador, or by a person or entity that the Government was unwilling or unable to control.  *Menjivar v. Gonzales*, 416 F.3d 918, 921-22  (8th Cir. 2005).  The court did not, therefore, reach the question whether the alien was a member of a particular social group.  *See also Ortiz-Araniba v. Keisler*, 505 F.3d 39 (1st Cir. 2007); *Lopez-Soto v. Ashcroft*, 383 F.3d 228 (4th Cir. 2004).

In other cases, the circuit courts have rejected claims that gang members, or those who could be identified as such, are members of a particular social group. *Arteaga v. Mukasey*, 511 F.3d 940 (9th Cir. 2007); *Castellano-Chacon v. INS*, 341 F.3d 533 (6th Cir. 2003), *modified on other grounds*, *Almuhtaseb v. Gonzales*, 453 F.3d 743 (6th Cir. 2006).  The Third Circuit, in the case involving a Honduran applicant, remanded the record for our consideration of the issue presented in the instant case. *Valdiviezo-Galdamez v. Att'y Gen. of U.S.*, 502 F.3d 285 (3d Cir. 2007).

In deciding this question, we are guided by our recent decisions holding that membership in a purported social group requires that the group have particular and well-defined boundaries, and that it possess a recognized level of social visibility.  *See Matter of A-M-E- & J-G-U-*, 24 I&N Dec. 69 (BIA 2007), *aff'd*, *Ucelo-Gomez v. Mukasey*, 509 F.3d 70 (2d Cir. 2007); *Matter of C-A-*, 23 I&N Dec. 951 (BIA 2006), *aff'd*, *Castillo-Arias v. U.S. Att'y Gen.*, 446 F.3d 1190 (11th Cir. 2006), *cert. denied sub nom. Castillo-Arias v. Gonzales*, 127 S. Ct. 977 (2007).  These concepts of "particularity" and "social visibility" give greater specificity to the definition of a social group, which was first determined in *Matter of Acosta*, 19 I&N Dec. 211, 233 (BIA 1985), to be a group whose members "share a

common, immutable characteristic . . . that members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences."

The Federal circuit courts have explicitly found these concepts to be consistent with their own definitions of a particular social group. The relevant Federal court decisions in this regard include the following, in circuit order: *Elien v. Ashcroft,* 364 F.3d 392, 396-97 (1st Cir. 2004) (deferring to our interpretation of the term "social group"); *Ucelo-Gomez v. Mukasey*, *supra*, at 73-74 (affirming our social visibility and particularity requirements); *Lukwago v. Ashcroft*; 329 F.3d 157, 170-71 (3d Cir. 2003); *Fatin v. INS*, 12 F.3d 1233, 1240-42 (3d Cir. 1993) (accepting the Board's *Acosta* formulation); *Mwembie v. Gonzales*, 443 F.3d 405, 414-15 (5th Cir. 2006) (finding that government employment is not an immutable characteristic); *Rreshpja v. Gonzales*, 420 F.3d 551, 555-56 (6th Cir. 2005) (finding that a group of young, attractive women is too broad to qualify); *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 672-73 (7th Cir. 2005) (finding that an educated, landowning class of cattle farmers constitutes a social group); *Lwin v. INS*, 144 F.3d 505, 512 (7th Cir. 1998); *Makatengkeng v. Gonzales,* 495 F.3d 876, 881 (8th Cir. 2007) (doubting whether the medical condition of albinism qualifies as a particular social group); *Raffington v. INS*, 340 F.3d 720, 723 (8th Cir. 2003) (finding the mentally ill in Jamaica "too large and diverse a group to qualify"); *Arteaga v. Mukasey, supra*, at 944-45 (applying the social visibility and particularity requirements); *Niang v. Gonzales*, 422 F.3d 1187, 1198-99 (10th Cir. 2005) (deferring to the *Acosta* standard); *Castillo-Arias v. U.S. Att'y Gen.*, *supra*, at 1197-98 (applying the social visibility and particularity requirements). *But see Hassan v. Gonzales*, 484 F.3d 513, 518 (8th Cir. 2007) (recognizing Somali females as a particular social group because of 98% prevalence of female genital mutilation); *Mohammed v. Gonzales*, 400 F.3d 785 (9th Cir. 2005).

For the reasons stated below, we find that neither of the social groups proposed by the respondents satisfies the standards of "particularity" or "social visibility" that we have recently explicated. We agree with the Immigration Judge that "youth" is not an entirely immutable characteristic but is, instead, by its very nature, a temporary state that changes over time. The mutability of age is reflected in this case by the fact that the male respondents are now 18 years old, and the female respondent is 21. Therefore, the respondents are no longer considered "children," as that term is commonly understood.[1] In saying this, however, we acknowledge that the mutability of age is not within

---

[1] The respondents have described an even more particularized subset within the proposed group, i.e., "young children" between the ages of 9 and 16 years old, of which they have now aged out.

one's control, and that if an individual has been persecuted in the past on account of an age-described particular social group, or faces such persecution at a time when that individual's age places him within the group, a claim for asylum may still be cognizable.

Furthermore, youth who have been targeted for recruitment by, and resisted, criminal gangs may have a shared past experience, which, by definition, cannot be changed. However, this does not necessarily mean that the shared past experience suffices to define a particular social group for asylum purposes. *See Gomez v. INS*, 947 F.2d 660, 663-64 (2d Cir. 1991) (finding that a woman who had been beaten and raped by guerrillas in her youth was not, for that reason, a member of a particular social group for asylum purposes); *see also Rreshpja v. Gonzales*, *supra*, at 556 (stating that "a social group may not be circularly defined by the fact that it suffers persecution"); *Castellano-Chacon v. INS*, *supra*, at 548; *Matter of C-A-*, *supra*, at 958. Further, we do not find that in this case the social group can be defined exclusively by the fact that its members have been subjected to harm in the past (i.e., forced gang recruitment and any violence associated with that recruitment), although this may be a relevant factor in considering the group's visibility in society, as discussed further in section 2 below. *See Matter of C-A-*, *supra*, at 960.

### 1. Particularity

We held in *Matter of A-M-E- & J-G-U-*, *supra*, at 73-74, that the respondents' proposed group of "wealthy" Guatemalans was not so readily "identifiable"or sufficiently defined to meet the requirements of a *particular* social group within the meaning of the refugee definition. *See also Davila-Mejia v. Mukasey*, No. 07-2567, 2008 WL 2630085, at *3-4 (8th Cir. July 7, 2008) (finding that a proposed group of "competing family business owners" is too "amorphous" under Board and circuit court standards to constitute a "particular" social group). The essence of the "particularity" requirement, therefore, is whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons. While the size of the proposed group may be an important factor in determining whether the group can be so recognized, the key question is whether the proposed description is sufficiently "particular," or is "too amorphous . . . to create a benchmark for determining group membership." *Davila-Mejia v. Mukasey*, *supra*, at *3 (citing *Matter of A-M-E- & J-G-U-*, *supra*, at 76) . Under these standards, the respondents' proposed groups fail the particularity requirement of the refugee definition.

The male respondents attempt to limit or define their proposed group by claiming that it is comprised of male children who lack stable families and meaningful adult protection, who are from middle and low income classes, who live in the territories controlled by the MS-13 gang, and who refuse recruitment. However, these characteristics remain amorphous because "people's ideas of what those terms mean can vary." *Davila-Mejia v. Mukasey*, *supra*, at *3. Moreover, there is no evidence in the record to show that gang members limit recruitment efforts to male children who fit the above description, or do so in order to punish them for these characteristics, although these factors perhaps make the potential recruit an easier and more desirable target.

The female respondent contends that she belongs to a social group that includes "family members" of Salvadoran youth who have been subjected to recruitment efforts by MS-13 and who have rejected or resisted membership in the gang. The proposed group of "family members," which could include fathers, mothers, siblings, uncles, aunts, nieces, nephews, grandparents, cousins, and others, is also too amorphous a category.[2]

Our conclusion is supported by the holdings of the circuit courts in analogous cases. The Second Circuit in *Ucelo-Gomez v. Mukasey*, *supra*, affirmed our findings that "wealth" and "affluence" are too subjective to serve as boundaries of a cognizable social group. As the court stated, "If 'wealth' defined the boundaries of a particular social group, a determination about whether any petitioner fit into the group (or might be perceived as a member of the group) would necessitate a sociological analysis as to how persons with various assets would have been viewed by others in their country. . . . Moreover, because money attracts thieves . . . and more money attracts more and better thieves, it would be impractical for [Immigration Judges] to distinguish between petitioners who are targeted or held to ransom because of their class status or merely because that's where the money is." *Id.* at 73.

For similar reasons, the purported social groups in this case lack particularity. They make up a potentially large and diffuse segment of society, and the motivation of gang members in recruiting and targeting young males could arise from motivations quite apart from any perception that the males in question were members of a class. Similarly, in *Castillo-Arias v. United States Attorney General*, *supra*, at 1198, the Eleventh Circuit affirmed our finding that noncriminal informants working against a Colombian drug cartel did not

---

[2] We note that the respondents testified that gang members attempted to recruit all the young males in their neighborhood. They do not claim that the MS-13 targeted *only* their family. Therefore, we need not address the question whether "family" alone is a social group under the circumstances of this case.

constitute a particular social group, in part because the proposed group was potentially too numerous or inchoate.

The Eighth Circuit's decision in *Hassan v. Gonzales*, *supra*, is distinguishable because, while recognizing a social group that in other contexts might be considered broad and diffuse, and certainly is large, the defining characteristics of the group—being female and subject to FGM—are sufficiently distinct in the context of Somali culture to meet the requirement of particularity. This case is far more analogous to the Ninth Circuit's decision in *Ochoa v. Gonzales*, 406 F.3d 1166 (9th Cir. 2005), which rejected the claim that Colombian business owners who refused demands from narcotics traffickers are a particular social group. Like the purported social group in *Ochoa*, the groups asserted here are too broad to qualify because "[t]here is no unifying relationship or characteristic to narrow this diverse and disconnected group." *Id.* at 1171.

## 2. Social Visibility

We recently reaffirmed the importance of social visibility as a factor in the particular social group determination in *Matter of A-M-E- & J-G-U-*, *supra* (holding that "affluent Guatemalans" did not have sufficient social visibility to be perceived as a group by society), and *Matter of C-A-*, *supra* (holding that "noncriminal informants working against the Cali drug cartel" in Colombia were not a particular social group and addressing the importance of the social visibility of the claimed social group).[3] In reaffirming the requirement that the shared characteristic of the group should generally be recognizable by others in the community, we relied, in part, on the Second Circuit's view that "'the attributes of a particular social group must be recognizable and discrete.'" *Matter of C-A-*, *supra*, at 956 (quoting *Gomez v. INS*, *supra*, at 664). In addition, we referred to the 2002 guidelines of the United Nations High Commissioner for Refugees, which endorse an approach in which an important factor is whether the members of the group are "'perceived as a group by society.'" *Matter of C-A-*, *supra*, at 956 (quoting UNHCR, Guidelines on International Protection: "Membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees, U.N. Doc. HCR/GIP/02/02, ¶ 11 (May 7, 2002)) .

The question whether a proposed group has a shared characteristic with the requisite "social visibility" must be considered in the context of the country

---

[3] In *Matter of C-A-*, *supra*, at 956-57, we also noted that we do not generally require a "voluntary associational relationship," "cohesiveness," or "homogeneity among group members."

of concern and the persecution feared. *Matter of A-M-E- & J-G-U-*, *supra*, at 74. The respondents in this case are victims of harassment, beatings, and threats from a criminal gang in El Salvador. There is little in the background evidence of record to indicate that Salvadoran youth who are recruited by gangs but refuse to join (or their family members) would be "perceived as a group" by society, or that these individuals suffer from a higher incidence of crime than the rest of the population.

The respondents assert that they have a specific reason (i.e., their refusal to join the gang) to fear that the MS-13 would subject them to more violence than the general population. We do not doubt, as the respondents' expert witness testified, that gangs such as the MS-13 retaliate against those who refuse to join their ranks. However, such gangs have directed harm against anyone and everyone perceived to have interfered with, or who might present a threat to, their criminal enterprises and territorial power. The respondents are therefore not in a substantially different situation from anyone who has crossed the gang, or who is perceived to be a threat to the gang's interests. *See Matter of C-A-*, *supra*, at 960.

The Department of State 2004 country reports on human rights practices in El Salvador do not suggest that victims of gang recruitment are exposed to more violence or human rights violations than other segments of society.[4] Committees on Foreign Relations and International Relations, 109th Cong., 1st Sess., *Country Reports on Human Rights Practices for 2004* 2353 (Joint Comm. Print 2005) ("*2004 Country Reports*"), *available at* http://www.state.gov/g/drl/rls/hrrpt/2004/41760.htm. Rather, gang violence and crime in El Salvador appear to be widespread, and the risk of harm is not limited to young males who have resisted recruitment, or their family members, but affects all segments of the population. Indeed, an article submitted by the respondent indicates that MS-13 gang members in Central America have resorted to random violence against the general population as a means to protest against the crackdown on gang activities in the country. *See* Ana Arana, *How the Street Gangs Took Central America*, Foreign Affairs, vol. 84, number 3, May/June 2005, at 98. Notably, neither the *2004 Country Reports*, nor more recent reports, mention forced recruitment by gang members or persecution against individuals who resist the gang, and the respondents

---

[4] We also consider and take administrative notice of recent reports issued by the State Department, including the 2007 country reports on human rights practices in El Salvador. *See* Bureau of Democracy, Human Right, and Labor, U.S. Dep't of State, *El Salvador Country Reports on Human Rights Practices - 2007* (Mar. 11, 2008), *available at* http://www.state.gov/g/drl/rls/hrrpt/2007/100639.htm; *see also Francois v. INS*, 283 F.3d 926, 933 (8th Cir. 2002); *Wojcik v. INS*, 951 F.2d 172, 173 (8th Cir. 1991).

have not submitted evidence that persuades us that gangs commit violent acts for reasons other than gaining more influence and power, and recruiting young males to fill their ranks.

While the respondents present sympathetic personal circumstances, victims of gang violence come from all segments of society, and it is difficult to conclude that any "group," as actually perceived by the criminal gangs, is much narrower than the general population of El Salvador. The respondents have provided no persuasive evidence, and we have no reason to believe, that the general societal perception would be otherwise. Accordingly, we conclude that the proposed group, which consists of young Salvadorans who have been subject to recruitment efforts by criminal gangs, but who have refused to join for personal, religious, or moral reasons, fails the "social visibility" test and does not qualify as a particular social group. The family members of such Salvadoran youth also do not constitute a particular social group.

## B. Political Opinion

The respondents argue on appeal that the MS-13 attempted to forcibly recruit the male respondents into their gang, and that the gang persecuted the respondents on account of their anti-gang political opinion.[5] Given the circumstances of this case, we find that the respondents' argument is foreclosed by *INS v. Elias-Zacarias*, *supra*, in which the Court held that a guerrilla organization's attempt to conscript a Guatemalan native into its military forces did not necessarily constitute "persecution on account of political opinion." In that case, the Guatemalan native failed to show either a political motive in resisting recruitment by guerrillas or a well-founded fear of guerrillas persecuting him because of that political opinion. Rather, he

---

[5] The respondents contend that the Immigration Judge failed to evaluate their claim of persecution on account of political opinion. We disagree. The Immigration Judge addressed the respondents' claim and determined that they had not established the requisite nexus to political opinion. Inasmuch as the facts of the case are not in dispute, we need not remand for further fact-finding. *See* 8 C.F.R. § 1003.1(d)(3)(iv) (2008). The record before us is adequate to allow us to perform de novo review of the legal issues presented, specifically, whether the respondents established that they were persecuted "on account of" a protected ground. *See* 8 C.F.R. § 1003.1(d)(3)(ii); Board of Immigration Appeals: Procedural Reforms To Improve Case Management, 67 Fed. Reg. 54,878, 54,890 (Aug. 26, 2002) (Supplementary Information); *see also Li Fang Lin v. Mukasey*, 517 F.3d 685, 692 n.10 (4th Cir. 2008); *Rotinsulu v. Mukasey*, 515 F.3d 68, 73 (1st Cir. 2008) (finding that 8 C.F.R. § 1003.1(d)(3)(iv) was not intended to restrict the Board's powers of review); *Belortaja v. Gonzales*, 484 F.3d 619, 624 (2d Cir. 2007); *Matter of V-K-*, 24 I&N Dec. 500 (BIA 2008); *Matter of A-S-B-*, 24 I&N Dec. 493, 496-97 (BIA 2008).

testified that he refused to join the guerrillas because he was afraid that the Guatemalan Government would retaliate against him and his family.

We conclude that the Court's analysis in *Elias-Zacarias* is applicable to this case. The respondents claim to fear retaliation by the MS-13 for their resistance to recruitment efforts, yet they have failed to show a political motive in resisting gang recruitment or a well-founded fear of future persecution on account of their political opinion. Indeed, there is no evidence in the record that the respondents were politically active or made any anti-gang political statements.

The respondents did not establish what political opinion, if any, they held, and they have provided no evidence, direct or circumstantial, that the MS-13 gang in El Salvador imputed, or would impute to them, an anti-gang political opinion. Nor have they established that the gang persecuted or would persecute them on the basis of such opinion. There is no indication that the MS-13 gang members who pursued the respondents had any motives other than increasing the size and influence of their gang. We therefore find that the respondents failed to demonstrate that they were persecuted or have a well-founded fear of persecution based on actual or imputed political opinion. *See also Zacarias-Velasquez v. Mukasey*, 509 F.3d 429 (8th Cir. 2007) (finding that even if guerrillas attempted to recruit the respondent, he did not allege that his refusal to join them was an expression of political opinion); *Bartolo-Diego v. Gonzales*, 490 F.3d 1024 (8th Cir. 2007) (holding that guerrilla attempts to forcibly compel a person to join them, absent additional evidence that the conscription was motivated by that person's political opinion, are insufficient to compel a finding of persecution on account of political belief); *Matter of R-O-*, 20 I&N Dec. 455 (BIA 1992).

For the reasons discussed above, we agree with the Immigration Judge's finding that the motivation of the gang members was not to punish the respondents based on their social group, political opinion, or other protected characteristic, and that the respondents have not shown the "nexus" required by the definition of a refugee.[6] *See* section 101(a)(42)(A) of the Act; *INS v. Elias Zacarias*, *supra*. Inasmuch as the respondents have failed to satisfy the burden of proof required for asylum, it follows that they have also failed to satisfy the higher standard required for withholding of removal. *See INS v. Stevic*, 467 U.S. 407 (1984). We need not address the question whether the respondents established that the Government of El Salvador was unable or

---

[6] In addition, while we acknowledge that the male respondents were physically mistreated and all of the respondents were threatened, the record does not establish that the incidents described by the respondents rise to the level of persecution. *See Zakirov v. Ashcroft*, 384 F.3d 541, 546 (8th Cir. 2004).

unwilling to control the MS-13 criminal gang because the respondents' failure to demonstrate the requisite nexus is dispositive.

## III.  CONCLUSION

We concur with the Immigration Judge's finding that the respondents failed to demonstrate that either Salvadoran youth who refused recruitment into the MS-13 criminal gang or their family members constitute a particular social group.  We further agree that the respondents failed to demonstrate that they were persecuted or fear persecution on account of their political opinion and that they therefore did not establish eligibility for asylum and withholding of removal.  In addition, the respondents do not raise any arguments on appeal challenging the Immigration Judge's denial of protection under the Convention Against Torture, and we see no reason to disturb the Immigration Judge's decision on this basis.  Accordingly, we will dismiss the respondents' appeal.

**ORDER:**  The appeal is dismissed.