# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1724

_____

| | | |
|---|---|---|
| Oscar Alexander Granados Gaitan, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Petition for Review of an Order of |
| | * | the Board of Immigration Appeals. |
| Eric H. Holder, Jr., Attorney | * | |
| General of the United States, | * | |
| | * | |
| Respondent, | * | |
| | * | |
| | * | |
| United Nations High Commissioner | * | |
| for Refugees, | * | |
| | * | |
| Amicus Curiae. | * | |

_____

Submitted: May 12, 2011
Filed: March 1, 2012

_____

Before WOLLMAN, BYE, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Oscar Alexander Granados Gaitan, a native and citizen of El Salvador, entered the United States in 2002 to escape recruitment into a gang in his home country. Gaitan now faces removal and has petitioned this Court to review the decision of the Board of Immigration Appeals (BIA) that affirmed an immigration judge's (IJ) denial

of Gaitan's petition for asylum, withholding of removal, and relief under the Convention Against Torture. We deny the petition for review.

## I.

In April 2002, Gaitan entered the United States without inspection in order to escape recruitment into the notorious gang "Mara Salvatrucha" or "MS-13." Approximately two years earlier, when Gaitain was twelve years old, Gaitan was approached by members of MS-13 who attempted to recruit Gaitan into their gang. Gaitan refused this initial invitation as well as subsequent bids from gang members. He was never physically harmed during his interactions with MS-13. However, the gang members threatened to harm Gaitan and his family if he did not join.

On August 10, 2007, the United States Department of Homeland Security (DHS) initiated removal proceedings against Gaitan by filing a Notice to Appear with the immigration court. DHS charged Gaitan with being removable under 8 U.S.C. § 1182(a)(6)(A)(i), for being present in the United States without being admitted or paroled. Gaitan appeared before an IJ for an individual merits hearing. In responding to the Notice to Appear, Gaitan admitted the factual allegations and conceded the charge of removability. However, Gaitan sought relief from removal in the form of asylum, withholding of removal, and under the Convention Against Torture. Gaitan claimed that he was a member of a "particular social group" composed of young males that have been previously recruited by MS-13 and are opposed to the nature of gangs. To support this claim, Gaitan testified about his experience in El Salvador and gang members' efforts to recruit him. Gaitan also submitted written documentation regarding the ongoing struggle in El Salvador for school-aged males to resist coerced recruitment by gangs.

The IJ issued an oral decision rejecting Gaitan's claims for relief. The IJ found that Gaitan's testimony was not sufficiently detailed or cohesive to make a positive

credibility finding. The IJ then stated that even if Gaitan was credible, he failed to show eligibility for asylum on the basis of membership in a particular social group. In making this finding, the IJ relied heavily on the BIA's decision in Matter of S-E-G-, 24 I. & N. Dec. 579 (BIA 2008), which the IJ found controlling in Gaitan's case.

Gaitan appealed to the BIA. Following a single-member review, the BIA overturned the IJ's ruling on credibility but upheld the IJ's decision regarding the merits of Gaitan's claims for relief. Like the IJ, the BIA cited Matter of S-E-G- in support of its denial of Gaitan's appeal.

II.

"[T]his court has jurisdiction of 'constitutional claims or questions of law raised upon a petition for review.'" Solis v. Holder, 647 F.3d 831, 832 (8th Cir. 2011) (quoting 8 U.S.C. § 1252(a)(2)(D)), petition for cert. filed, 80 B.N.A. U.S.L.W. 3336 (U.S. Oct. 26, 2011) (No. 11-571). "Where . . . the BIA issues an independent decision without adopting the IJ's conclusions, we review only the BIA decision." Constanza v. Holder, 647 F.3d 749, 753 (8th Cir. 2011) (per curiam). "A denial of asylum is reviewed for abuse of discretion; underlying factual findings are reviewed for substantial support in the record." Hassan v. Gonzalez, 484 F.3d 513, 516 (8th Cir. 2007). "We review questions of law de novo but accord substantial deference to the BIA's interpretation of immigration statutes and regulations." Puc-Ruiz v. Holder, 629 F.3d 771, 777 (8th Cir. 2010).

## III.

To qualify for asylum under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 et seq., the burden is on Gaitan to show that he is a refugee, in other words, to show that he is a person who is outside the country of his nationality "'who is unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, that country because of persecution or a well-founded fear or persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" Davila-Mejia v. Mukasey, 531 F.3d 624, 627-28 (8th Cir. 2008) (quoting 8 U.S.C. § 1101(a)(42)(A)). The phrase "particular social group" is not expressly defined in the INA. Ngengwe v. Mukasey, 543 F.3d 1029, 1033 (8th Cir. 2008). As a result, we give Chevron deference to the BIA's reasonable interpretation of the phrase and will not overturn the BIA's conclusion unless it is "arbitrary, capricious, or manifestly contrary to the statute." Ngengwe, 543 F.3d at 1033; Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 842-44 (1984).

In 1985, the BIA defined a "particular social group" as "a group of persons all of whom share a common, immutable characteristic. . . . that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." Matter of Acosta, 19 I. & N. Dec. 211, 233 (BIA 1985), overruled on other grounds by Matter of Mogharrabi, 19 I. & N. Dec. 439 (BIA 1987). The BIA subsequently expounded on the meaning of "particular social group," finding that factors such as "social visibility" and "particularity" were relevant in determining whether a purported social group warrants protection under the INA. See In re A-M-E & J-G-U-, 24 I. & N. Dec. 69, 74-76 (BIA 2007); In re C-A-, 23 I. & N. Dec. 951, 957-61 (BIA 2006).

In Matter of S-E-G-, 24 I. & N. Dec. at 582, the BIA further refined its definition of a "particular social group" as "requir[ing] that the group have particular

-4-

and well-defined boundaries, and that it possess a recognized level of social visibility." According to the BIA, "[t]he essence of the 'particularity' requirement . . . is whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons." Id. at 585. Similarly, social visibility asks "whether the members of the group are perceived as a group by society," such that "these individuals suffer from a higher incidence of crime than the rest of the population." Id. at 586-87 (citation and internal quotation marks omitted).

In his petition for review, Gaitan focuses his challenge on the BIA's finding that he was not eligible for asylum because he was not a member of a particular social group.[1] Gaitan argues that our precedent does not mandate that we affirm the decision of Matter of S-E-G- because Matter of S-E-G- unreasonably transformed social visibility and particularity from relevant factors to be considered into requirements that must be met to show membership in a particular social group. Gaitan asserts that these requirements are not entitled to deference by this Court because they are "conflicting, confusing, and illogical."

---

[1] Gaitan does not address the denial of relief under the Convention Against Torture in his brief. Any argument based on that ground is therefore deemed waived. See Tinajero-Ortiz v. United States, 635 F.3d 1100, 1103 n.3 (8th Cir.), cert. denied, 132 S. Ct. 315 (2011). Gaitan notes that he does not waive his claim that he is otherwise eligible for relief in the form of withholding of removal under the INA. However, "[t]he standard for withholding of removal, a clear probability of persecution, is more rigorous than the well-founded fear standard for asylum. An alien who fails to prove eligibility for asylum cannot meet the standard for establishing withholding of removal." Turay v. Ashcroft, 405 F.3d 663, 667 (8th Cir. 2005) (internal citations omitted). Because we find that Gaitan is not eligible for asylum, Gaitan is unable to meet the standard for establishing withholding of removal.

At the time that he filed his appeal, Gaitan was correct that no panel of this Court had gone so far as to refer to social visibility and particularity as requirements. Yet our recent decisions in Constanza v. Holder, 647 F.3d at 753-54, and Ortiz-Puentes v. Holder, 662 F.3d 481 (8th Cir. 2011), adopted such a reading. In Constanza, we denied a petition for review by a native and citizen of El Salvador who applied for asylum on the basis that he would be persecuted by MS-13 gang members because of "his membership in social groups defined as persons resistant to gang membership, persons who have returned from the United States and are perceived as affluent, and persons who fear harm to their families from gangs." 647 F.3d at 752. The BIA rejected Constanza's petition and found that his articulated social groups were "too broad and indeterminate for immigration purposes." Id. at 752. In denying Constanza's petition for review, we were "persuaded by the BIA's conclusion, as well as authority from other circuits, that 'persons resistant to gang violence' are too diffuse to be recognized as a particular social group." Id. at 754 (citing Matter of S-E-G-, 24 I. & N. Dec. at 588). Accordingly, we stated that "a social group requires sufficient particularity and visibility such that the group is perceived as a cohesive group by society." Id. at 753.

Likewise, in Ortiz-Puentes, we denied a petition for review by three natives and citizens of Guatemala who claimed their social group was comprised of "young Guatemalans who refused to join gangs and were persecuted – beaten – as a result." 662 F.3d at 483. We again noted with approval the BIA's decision in Matter of S-E-G-, and stated that "[a] group of persons defined as those who suffer violence because they refused to join criminal gangs 'lacks the visibility and particularity required to constitute a social group' for purposes of 8 U.S.C. § 1101(a)(42)(A)." Id. (quoting Constanza, 647 F.3d at 753-54).

We are bound by the decision of the earlier panels. Owsley v. Luebbers, 281 F.3d 687, 690 (8th Cir. 2002) (per curiam) ("It is a cardinal rule in our circuit that one

panel is bound by the decision of a prior panel."). As a result, this Court cannot find that the social visibility and particularity requirements articulated in Matter of S-E-G- are arbitrary or capricious.

In the present case, Gaitan sought relief from removal based on his membership in a particular social group that he characterized as "young males from El Salvador who have been subjected to recruitment by MS-13 and who have rejected or resisted membership in the gang based on personal opposition to the gang." After a careful review of the record, we agree with the BIA that Gaitan's articulated social group is not sufficiently narrowed to cover a discrete class of persons who would be perceived as a group by the rest of society. Instead, Gaitan "is no different from any other Salvadoran . . . that has experienced gang violence." Constanza, 647 F.3d at 754. Accordingly, Gaitan has failed to establish that any mistreatment by MS-13 "occurred because of his membership in a particular social group." Id.

IV.

We deny the petition for review.

BYE, Circuit Judge, concurring.

Based upon our recent decisions in Constanza v. Holder, 647 F.3d 749 (8th Cir. 2011) (per curiam) and Ortiz-Puentes v. Holder, 662 F.3d 481 (8th Cir. 2011), I concur in the result reached by the majority. I do so reluctantly, however, and write separately to express my disagreement with our circuit's as-a-matter-of-course adoption of "social visibility" and "particularity" as requirements for establishing "membership in a particular social group." See 8 U.S.C. § 1101(a)(42)(A). While both decisions cited with approval the BIA's new approach to defining "particular social group," neither had before it the issue raised in this appeal: did the BIA act

-7-

arbitrarily and capriciously in adding the requirements of "social visibility" and "particularity" to its definition of "particular social group." While I am convinced it did, I am nonetheless bound by circuit precedent and therefore concur in the result.

Our circuit only recently addressed the BIA's new approach to defining "particular social group." While both <u>Constanza</u> and <u>Ortiz-Puentes</u> grafted the requirements of "social visibility" and "particularity" to petitioners' social groups claims, neither panel offered any explanation as to why the addition of these new requirements—which are very clearly inconsistent with the BIA's prior decisions—should not be deemed arbitrary and capricious. Neither panel inquired as to whether the BIA had provided a good reason, or any reason at all, for departing from established precedent. Neither asked if the BIA's new approach to defining "particular social group" amounted to an arbitrary and capricious change from agency practice. Instead, we simply adopted the new approach, as a matter of course, offering no substantial reason ourselves for this shift in direction. As a result, I fear we have chosen the wrong direction.

In order to understand why the BIA's addition of the "social visibility" and "particularity" requirements to the definition of "particular social group" is arbitrary and capricious, some background information is necessary. The BIA first attempted to define "particular social group" in <u>Matter of Acosta</u>, 19 I. & N. Dec. 211 (B.I.A. 1985). In <u>Acosta</u>, the BIA relied on the canon of *ejusdem generis* to construe "membership in a particular social group" in a way which most closely resembles the definition of the other four grounds of persecution under the Immigration and Nationality Act (Act): race, religion, nationality, and political opinion. <u>Id.</u> at 233. After deducing commonalities between the five bases of persecution cognizable under the Act, the BIA defined "particular social group" as a "group of persons all of whom share a common, immutable characteristic," which may be either "an innate one such as sex, color, or kinship ties" or a "shared past experience such as former military

-8-

leadership or land ownership." <u>Id.</u> In all such circumstances, BIA explained, the characteristic uniting the group must be "one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." <u>Id.</u> Because an occupation is not something individuals are either unable to change or, as a matter of conscience, should not be required to change, the BIA rejected an asylum claim by a taxi driver in the city of San Salvador premised on his membership in a taxi cooperative whose members were targeted by the guerillas for having refused to participate in guerrilla-sponsored work stoppages. <u>Id.</u> at 234.

During the next twenty years, the BIA applied the immutability definition of <u>Acosta</u> in a variety of contexts. The BIA's published decisions recognized as a "particular social group" former members of Salvadorian national police (who could not change their past experience of serving in the police), <u>see</u> <u>In re Fuentes</u>, 19 I. & N. Dec. 658 (B.I.A. 1988); members of the Marehan subclan of the Darood clan in Somalia (who shared kinship ties and linguistic commonalities), <u>see</u> <u>In re H-</u>, 21 I. & N. Dec. 337 (B.I.A. 1996); Filipinos of mixed Filipino-Chinese ancestry (because their traits were immutable ), <u>see</u> <u>In re V-T-S-</u>, 21 I. & N. Dec. 792 (B.I.A. 1997); young women of a certain Togo tribe who have not yet had a female genital mutilation (FGM) and who opposed the practice on moral grounds (because the "characteristic of having intact genitalia is one that is so fundamental to the individual identity of a young woman that she should not be required to change it"), <u>see</u> <u>In re Kasinga</u>, 21 I. & N. Dec. 357 (B.I.A. 1996); and homosexuals in Cuba (based on the Board's recognition of homosexuality as an immutable characteristic), <u>see</u> <u>In re Toboso-Alfonso</u>, 20 I. & N. Dec. 819, 822 (B.I.A. 1990). With some variations, all circuits adopted the <u>Acosta</u> definition of "particular social group." <u>See generally</u> Fatma E. Marouf, The Emerging Importance of "Social Visibility" in Defining a "Particular Social Group" and Its Potential Impact on Asylum Claims Related to Sexual Orientation and Gender, 27 Yale L. & Pol'y Rev. 47, 53 & n.24 (2008) (stating federal

courts "generally have followed <u>Acosta</u>" and cataloging relevant precedents) (hereinafter "The Emerging Importance of Social Visibility"). Our circuit adopted the <u>Acosta</u> definition as well, although it seemingly expanded it following the Ninth Circuit's lead to also permit social groups based on a "voluntary associational relationship among the purported members." <u>Safaie v. INS</u>, 25 F.3d 636, 640 (8th Cir. 1994) (theorizing a group of Iranian women who refuse to conform to Iranian customs relating to dress and behavior and whose opposition is so profound that they would choose to suffer the severe consequences of noncompliance "may well satisfy the definition") (citing the standard in <u>Sanchez-Trujillo v. INS</u>, 801 F.2d 1571, 1576 (9th Cir. 1986)).

Beginning in 2006, however, the BIA started deviating from the <u>Acosta</u> definition of "particular social group" by emphasizing the importance of social visibility of a given group. In <u>Matter of C-A-</u>, for example,[2] the BIA reiterated its

---

[2]The BIA signaled its intention to break away from the <u>Acosta</u> standard as early as 2001, in its decision in <u>Matter of R-A-</u>, 22 I. & N. Dec. 906 (B.I.A. 2001). There, the BIA refused to accord a social group status to a group of "Guatemalan women who have been involved intimately with Guatemalan male companions who believe that women are to live under male domination." <u>Id.</u> at 917-18. Although the outcome of the opinion was unobjectionable even under the traditional <u>Acosta</u> standard, its logic was noteworthy for the BIA's insistence that the applicant demonstrate "how the characteristic is understood in the alien's society" and how "the potential persecutors . . . see persons sharing the characteristic as warranting suppression or the infliction of harm." <u>Id.</u> at 918. Because at the time <u>R-A-</u> was issued, the Immigration and Naturalization Service was in the process of finalizing a rule defining "membership in a particular social group," the Attorney General vacated the BIA's opinion pending the publication of that rule. <u>In re R-A-</u>, 22 I. & N. Dec. 906 (B.I.A. 2001). The proposed rule would incorporate <u>R-A-</u>'s consideration of social visibility, but only as one of several non-exclusive factors. Asylum & Withholding Definitions, 65 Fed. Reg. 76,588, 76,594 (Dec. 7, 2000). Ultimately, the rule was never formalized, and the ball was back in the BIA's court to define the "particular social group"

-10-

adherence to <u>Acosta</u>, but listed "the extent to which members of a society perceive those with the characteristic in question as members of a social group" as a "relevant factor" in the analysis.  23 I. & N. Dec. 951, 956-57 (B.I.A. 2006).  Applying this standard, the BIA rejected the proposed social group of noncriminal drug informants working against the Cali drug cartel in Colombia in part because "the very nature of the conduct at issue is such that it is generally out of the public view."  <u>Id.</u> at 960.

The BIA continued the trend in <u>Matter of A-M-E & J-G-U-</u>, 24 I. & N. Dec. 69 (B.I.A. 2007), by refusing to recognize a social group of "affluent Guatemalans" targeted for ransom.  The BIA acknowledged the petitioners should not be expected to divest themselves of their wealth under the second prong of <u>Acosta</u>, but denied the claim on the basis of the applicants' inability to show "social visibility," <u>id.</u> at 75 (lamenting the lack of evidence to demonstrate "the general societal perception" of wealthy people was different from the common perception of groups at different socio-economic levels), and "particularity," <u>id.</u> at 76 (criticizing the proposed group for being "too amorphous" and "indeterminate").  In its reasoning, the BIA drew on the Second Circuit opinion in <u>Gomez v. INS</u>, 947 F.2d 660, 664 (2d Cir. 1991), where the court required members of a cognizable social group to possess "some fundamental characteristic in common which serves to distinguish them in the eyes of a persecutor—or in the eyes of the outside world in general."

The biggest transformation in the BIA's "particular social group" jurisprudence, however, came in its two most recent decisions issued on the same day in 2008: <u>Matter of S-E-G-</u>, 24 I. & N. Dec. 579 (B.I.A. 2008), and <u>Matter of E-A-G-</u>, 24 I. & N. Dec. 591 (B.I.A. 2008).  Both confronted claims of gang-related persecution under the rubric of membership in a particular social group.  In <u>E-A-G-</u>, the BIA refused to recognize social groups of "young persons who are perceived to be affiliated with

incrementally, on a case-by-case basis.

-11-

gangs (as perceived by the government and/or the general public)" and "persons resistant to gang membership (refusing to join when recruited)" because these groups "have not been shown to be part of a socially visible group within Honduran society, and the respondent [does not] possess[] any characteristics that would cause others in Honduran society to recognize him as one who has refused gang recruitment." 24 I. & N. Dec. at 593-94. In S-E-G-, the unsuccessful group was that of Salvadorian youth who have been subjected to recruitment efforts by the MS-13 and who have rejected and resisted membership in the gang based on their own personal, moral, and religious opposition to the gang's values and activities. 24 I. & N. Dec. at 579. Their claim for asylum failed because, according to the BIA, it did not fare well under the "recent decisions holding that membership in a purported social group requires that the group have particular and well-defined boundaries, and that it possess a recognized level of social visibility." Id. In essence, the decisions elevated the requirements of "social visibility" and "particularity" from merely some of the many factors in the holistic analysis of the issue to absolute prerequisites to establishing membership in a particular social group.

This new approach to defining "particular social group" split the circuits as to the validity and permissible extent of the BIA's reliance on "social visibility" and "particularity." Compare Valdiviezo-Galdamez v. Holder, 663 F.3d 582, 603-09 (3d Cir. 2011) (concluding the BIA's "social visibility" and "particularity" requirements are inconsistent with prior BIA decisions and rejecting the government's attempt to graft these additional requirements onto petitioner's social group claims); Gatimi v. Holder, 578 F.3d 611, 615-16 (7th Cir. 2009) (criticizing the BIA's decisions in S-E-G- and E-A-G- for being "inconsistent" with the BIA's precedents in Acosta and Kasinga and for failing to explain the reasons for adopting the "social visibility" criterion); Benitez Ramos v. Holder, 589 F.3d 426, 430-31 (7th Cir. 2009) (denouncing the BIA's insistence on "social visibility," sometimes in its literal form, and charging the BIA might not understand the difference between visibility in a

social sense and the external criterion sense); <u>Urbina-Mejia v. Holder</u>, 597 F.3d 360, 365-67 (6th Cir. 2010) (noting being a former gang member is an immutable characteristic and defining former members of the 18th Street gang as a "particular social group" based on their inability to change their past and the ability of their persecutors to recognize them as former gang members), <u>with Lizama v. Holder</u>, 629 F.3d 440, 447 (4th Cir. 2011) (upholding the BIA's definition of a particular social group as requiring that "(1) its members share common immutable characteristics, (2) these common characteristics give members 'social visibility, and (3) the group is defined with "sufficient particularity to delimit its membership"); <u>Ramos-Lopez v. Holder</u>, 563 F.3d 855, 862 (9th Cir. 2009) (upholding the BIA's adoption of the "social visibility" requirement); <u>Scatambuli v. Holder</u>, 558 F.3d 53, 60 (1st Cir. 2009) (rejecting petitioners' claims the BIA is precluded from considering the visibility of a group); <u>and Fuentes-Hernandez v. Holder</u>, 411 F. App'x 438, 438-39 (2d Cir. 2011) (stating individuals who resisted gang recruitment in El Salvador do not constitute a "particular social group" because their proposed group lacked "social visibility" and "particularity" and because the alleged persecution "did not bear the requisite nexus to a protected ground").

I agree with the circuits which hold the BIA's addition of the "social visibility" and "particularity" requirements to the definition of "particular social group" is arbitrary and capricious. First, as discussed above, these newly added requirements are inconsistent with prior BIA decisions. Specifically, they are in direct conflict with the definition of "particular social group" announced in <u>Acosta</u>. By stating this, I am in no way suggesting the BIA must continue to adhere to the <u>Acosta</u> definition. I am of course cognizant the BIA may "add new requirements to, or even change, its definition of 'particular social group'" over time. <u>Valdiviezo-Galdamez</u>, 663 F.3d at 608; <u>see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 57 (1983) (stating an agency may change its interpretation of a stature or regulation over time). The BIA, however, must explain its choice for doing

so because an unexplained departure from established precedent is generally "a reason for holding [the departure] to be an arbitrary and capricious change from agency practice[.]" Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981 (2005); see also FCC v. Fox Television Stations, Inc., 129 S.Ct. 1800, 1811 (2009) (stating "the agency must show that there are good reasons for the new policy"); Friends of Boundary Waters Wilderness v. Dombeck, 164 F.3d 1115, 1123 (8th Cir. 1999) (noting "a sudden and unexpected change in agency policy" may be characterized as arbitrary and capricious).

Because the BIA departed from its well-established Acosta definition without providing a reasonable explanation for its choice, the departure is arbitrary and capricious. Thus, although I am bound by our decisions in Constanza and Ortiz-Puentes, I cannot agree with our circuit's as-a-matter-of-course adoption of the BIA's new approach to defining "particular social group"—an approach which not only represents a stark departure from established precedent, but also eviscerates protections for many groups of applicants eligible under the agency's prior definition.

Therefore, I reluctantly concur in the result.

_____